**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DIANA LOVEJOY,<br><br>                                    Petitioner,<br><br>v.<br><br>MICHAEL PALLARES, Warden,<br><br>                                    Respondent. | Case No.:  3:22-cv-0267-L-GC<br><br>**ORDER: (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS AND (2) DENYING CERTIFICATE OF APPEALABILITY** |

## I.    INTRODUCTION

Before the Court is a First Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 filed by Diana Lovejoy, ("Lovejoy" or "Petitioner"), a state prisoner who is represented by counsel. (ECF No. 48, hereafter "FAP.") In the Petition, Lovejoy challenges her San Diego Superior Court conviction and sentence for conspiracy to commit murder and attempted murder in case number SCN363925. (*See id.*17–18.) The Court has reviewed the Petition (*id.*), the Answer and Memorandum of Points and Authorities in Support of the Answer (ECF Nos. 50, 50-1), the lodgments (ECF No. 51, *et seq.*), Petitioner's Traverse (ECF No. 52), and all the supporting documents submitted by both parties. For the reasons discussed below, the Court DENIES the Petition and DENIES a certificate of appealability.

## II.   FACTUAL BACKGROUND

The following statement of facts is taken from the California Court of Appeal opinion in *People v. Lovejoy, et al.*,[1] No. D073477, 2020 WL 4332967, at *1–6 (Cal. Ct. App. July 28, 2020). This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35–36 (1992).

Lovejoy and Mulvihill married in 2007 and had a son in 2012. Before their son's birth, they began having marital problems and tried marriage counseling and individual therapy. In or about June 2014, Lovejoy became employed. Mulvihill did not have a job at that time and was their son's primary caregiver, although they also had a nanny.

In July 2014, Lovejoy obtained a temporary restraining order against Mulvihill, falsely claiming that he had sexually assaulted her and their son. Mulvihill moved out of the family home and thereafter usually slept in his car. After initially being prevented from seeing his son as a result of Lovejoy's claims, Mulvihill was later able to have supervised visits with him and eventually had unsupervised visits. In November 2015, Mulvihill was awarded 50 percent custody of their son after Lovejoy's accusations were determined to be unfounded.

On June 26, 2016, after contentious marital dissolution proceedings, Lovejoy and Mulvihill entered into a marital settlement agreement. That agreement provided, inter alia, that Lovejoy would keep the family home and would pay Mulvihill a community property equalization payment of $120,000 within 90 days of the execution of the agreement (i.e., by September 25, 2016). That payment apparently was to be paid from either refinancing their community residence or the proceeds of the sale of a condominium unit separately owned by Lovejoy.

On Christmas Day in 2015, Lovejoy met her aunt, Diana Clark, at a restaurant. Lovejoy asked Clark to help her find someone to kill Mulvihill. It

/ / / / /

---

[1] Lovejoy's direct appeal was consolidated with that of her co-defendant, Weldon McDavid. (*See* ECF No. 51-38 at 2.)

3:22-cv-0267-L-GC

appeared to Clark that Lovejoy wanted Mulvihill dead and "had it all figured out." Clark told Lovejoy that she did not know anyone who could help her.

Lovejoy met McDavid in 2015 at the shooting range where he worked. He gave Lovejoy firearm training and self-defense lessons. They eventually began a sexual relationship and, beginning in November 2015, exchanged many phone calls and texts. At some point prior to August 15, 2016, Lovejoy and McDavid formed a plan for McDavid to lure Mulvihill to a secluded area and kill him. Lovejoy agreed to pay McDavid $1,000 initially, and an additional $1,000 after he killed Mulvihill. According to their plan, McDavid would call Mulvihill and tell him a story that would cause him to go to the secluded area where McDavid would be waiting for him. McDavid told Lovejoy to buy a Tracfone that he could use to call Mulvihill without being identified. On August 15, Lovejoy entered a Best Buy store and purchased a Tracfone.

On August 31, 2016, McDavid performed reconnaissance at the secluded area where he planned to lure Mulvihill. On the evening of September 1, McDavid called Lovejoy, told her that he was ready to "get this over with," and asked her to meet him at a park-and-ride lot in Carlsbad. Lovejoy met McDavid there, drove him to the secluded area and dropped him off. Per McDavid's instructions, Lovejoy gave him some items belonging to her son (i.e., two towels) that he could place at the scene. McDavid thought that Mulvihill would recognize the items as belonging to his son and realize that the caller had access to his son. McDavid told Lovejoy that afterward, he would call her to pick him up.

At the scene, McDavid used one of the towels that Lovejoy had given him to wipe himself after defecating. He placed the other towel at the base of a power pole. At about 10:30 p.m., McDavid used the Tracfone to call Mulvihill. McDavid told Mulvihill that McDavid was a criminal investigator hired by Lovejoy and that he had some documents that Mulvihill would want to see regarding custody of his son. When Mulvihill asked questions about the documents, McDavid told him that he would just have to see them and that McDavid would call back in a few minutes. Two minutes later, McDavid called back and told Mulvihill that he would leave the documents at a location where Mulvihill could find them. McDavid stated that he would call back again and hung up. Mulvihill called the Carlsbad Police Department's nonemergency number and told the dispatcher about the calls. When he asked whether the calls seemed odd, the dispatcher stated that they seemed a little unusual, but did not seem concerned.

3:22-cv-0267-L-GC

McDavid called again and gave Mulvihill directions to the area where he said Mulvihill could find the documents taped to a power pole. Mulvihill was familiar with the area because he and Lovejoy had hiked and biked there before. McDavid told Mulvihill that this would be his "one chance" to see the documents. Because he could not risk having the custody case reopened, Mulvihill decided to go to the location to learn more about what was going on. Mulvihill was uncomfortable about going to the location alone, so he called his boss, Jason Kovach, who lived in a nearby apartment, and asked Kovach to accompany him. Kovach agreed and Mulvihill drove them to the designated location, which was about one mile from their homes. After exiting the car, Mulvihill carried a bright flashlight in his left hand and Kovach carried a baseball bat that Mulvihill had given him. Neither had a gun.

Mulvihill and Kovach walked along the path toward the power pole, which was about 150 feet away. Because it was very dark, they could not see anything without Mulvihill's flashlight. They saw a towel at the base of the power pole. Because Mulvihill could not see anything taped to the pole, he became suspicious and scanned the area with his flashlight. Hearing rustling in the bushes, Mulvihill shined his light in the direction of the noise and saw a person, McDavid, about 60 feet away, dressed in camouflage clothing. McDavid was lying prone on the ground and pointing a sniper rifle at Mulvihill through the bushes. Mulvihill said, "Hello?" twice and then either he or Kovach yelled "gun" or "run." As he turned to run, Mulvihill felt something hit him in the back. Mulvihill and Kovach heard shots being fired at them as they ran back to the car. They got into Mulvihill's car and fled the scene. While driving away, Mulvihill realized that he had been shot, pulled over, and called 911.

Police responded to Mulvihill's 911 call and took him to a hospital. He had sustained entry and exit wounds from a gunshot. The entry wound was below his right armpit. A CT scan showed small metallic fragments throughout Mulvihill's chest and active bleeding in his axilla. The axilla is a potentially lethal area because it contains major arteries, veins, and nerve structures, which, if injured, could cause a patient to bleed to death. Two bullet fragments were removed from his back.

After shooting Mulvihill, McDavid ran down a path to a road, called Lovejoy, and had her pick him up. As Lovejoy drove them back to the park-and-ride lot, McDavid told her that he had "messed up."

Investigating the incident, police found a rifle round jacket on the sidewalk near the power pole. The jacket was consistent with having been fired from an AR-15. Two towels were also found at the scene, one of which had fecal matter on it. Test results showed that the fecal matter contained McDavid's DNA.

Police discovered that the Tracfone used to call Mulvihill was purchased at a Best Buy store on August 15, 2016. The store's surveillance video from that date showed Lovejoy purchasing the phone. She was wearing a salmon-colored shirt and a khaki-colored skirt at the time. Police searched Lovejoy's home and found the shirt and skirt that she was wearing when she purchased the Tracfone. They also found towels that matched the towels found at the scene of the shooting. Lovejoy's computer showed that she had searched for information regarding moon phases. The sky is darkest when there is a new moon because no light emanates from the moon. On September 1, 2016, the night of the shooting, there was a new moon.

Police also searched McDavid's home and found numerous rifles, handguns, and upper and lower assemblies for AR-15's. They found a complete upper assembly for an AR-15 hidden under foam and sleeping bags on a garage shelf. That assembly had a suppressor and brass catcher attached to it. A brass catcher catches expended cartridge casings before they fall to the ground. The brass catcher contained seven used shell casings and one unused round. In McDavid's Jeep, they found a camouflage jacket and black pants that appeared to have dirt and plant material on them.

An amended information charged Lovejoy and McDavid with one count of conspiracy to commit murder (§§ 182, subd. (a)(1), 187, subd. (a)) (count 1) and one count of premeditated attempted murder (§§ 664, 187, subd. (a), 189) (count 2). The amended information further alleged that in committing each of those offenses, McDavid intentionally and personally discharged a firearm, causing great bodily injury (§ 12022.53, subd. (d)) and personally inflicted great bodily injury on Mulvihill (§ 12022.7, subd. (a)). It also alleged that in committing each of those offenses, Lovejoy was vicariously armed with a firearm (§ 12022, subd. (a)(1)).

At their joint trial, the prosecution presented evidence substantially as described *ante*. In his defense, McDavid called several witnesses who testified that he was a skilled marksman, implying that if McDavid had intended to kill Mulvihill, he could have. In particular, McDavid presented the testimony of Barry Reder, McDavid's shooting student and friend, who testified that

3:22-cv-0267-L-GC

McDavid could easily hit a target 100 yards away. McDavid also presented the testimony of Christopher Lazano, who stated that he knew McDavid from the Marine Corps when they were both shooting instructors at the School of Infantry at Camp Pendleton. Lazano believed that McDavid would not have any trouble hitting a target at center mass, even with ambient lighting. He testified that Marines are taught to never point a gun at anyone unless they intend to kill that person.

McDavid also presented the testimony of Vincent Kyzer, an active duty Marine gunner, who described the requirements for becoming a competent shooter in the Marine Corps. Marines are trained to shoot at a target's center mass (i.e., chest) because most of the arteries that cause major damage are located there. It is more difficult to shoot at a moving target than a stationary target. Marines are trained to go into darkness 30 minutes in advance to allow their eyes to adjust to poor lighting. If a light is shined on a shooter by the enemy, the shooter likely would shoot at the last known location of the target's center mass. If a shooter was planning to ambush an enemy, the shooter would place a marker at the location for the planned shooting and wait for the enemy to get close to that marker. Kyzer admitted that a power pole could serve as a marker for a shooter's range.

Kyzer testified that he knew McDavid from the Marine Corps and described him as a skilled, accurate, and expert rifleman while he was in the Marine Corps. Kyzer believed that McDavid would be "extremely accurate" using a rifle from a prone position and that, when McDavid was a Marine, he would never miss a target that was only 20 yards away. After McDavid left the Marine Corps, he became even more proficient in marksmanship and obtained instructor credentials.

McDavid testified in his own defense, stating that at the time of his arrest, he was working as a firearms instructor and salesman at a shooting range. He was a rifle, pistol, and shotgun instructor for the NRA. He had been a firearms instructor for 17 years, including while he was serving in the Marine Corps. He joined the Marine Corps in 1997 when he was 30 years old and left in 2009. While in the Marine Corps, he received firearms training and became a ninth award rifle expert and a seventh award pistol expert. Since his separation from the Marine Corps, his shooting skills had improved.

McDavid testified that he met Lovejoy in 2015 when he was her shooting instructor at the shooting range at which he worked. Lovejoy told him that she was going through a divorce and was having custody issues with

3:22-cv-0267-L-GC

Mulvihill. She told McDavid that Mulvihill used drugs and that, as a felon, illegally owned a firearm. She also told him that Mulvihill was molesting their son and had digitally penetrated her against her will. She stated that she had filed a police report regarding those incidents, but the police had done nothing.

McDavid testified that in June or July 2016, he and Lovejoy began discussing strategies to acquire evidence against Mulvihill so that she could obtain full custody of their son. They planned to lure Mulvihill to a secluded area by having McDavid call him and tell him that McDavid was a private investigator hired by Lovejoy. McDavid would tell Mulvihill that he had evidence of child abuse committed by Mulvihill, which would be left at the base of a power pole for Mulvihill to retrieve. McDavid testified: "[A]nybody who's not guilty of child abuse, in my mind, would not come out at night to meet someone or to pick up any evidence that they didn't know where it came from." McDavid said that he had planned to videotape Mulvihill retrieving the evidence in the dark and then set up a subsequent meeting at which he would try to sell Mulvihill a blank thumb drive that purportedly contained additional evidence of child abuse. Lovejoy was to pay McDavid $2,000 to gather that information on Mulvihill. McDavid testified that he and Lovejoy had never discussed that he would hurt or kill Mulvihill.

McDavid testified that on August 31, 2016, he went to the secluded location and performed reconnaissance. On September 1, on returning home from a shooting competition in Chico Hills, he got into an argument with his wife. Angry and frustrated, McDavid called Lovejoy and told her, "Let's just get this over with. So I can be done with this." He told Lovejoy to meet him at the park-and-ride lot in Carlsbad. When she arrived, McDavid placed in her car a bag containing the AR-15 gun that he had used earlier that day at the competition. When Lovejoy asked him why he brought the gun bag, he replied, "just in case." McDavid testified that he never intended to kill Mulvihill, but brought his AR-15 because he knew that Mulvihill owned a gun and he (McDavid) needed to be prepared in case Mulvihill brought the gun.

McDavid testified that in response to his request that Lovejoy bring something that Mulvihill would recognize as belonging to their son, she gave him two towels, which he planned to place at the base of the power pole. Lovejoy drove McDavid to the secluded area and dropped him off. McDavid told her to go home until he called after he got the information and needed to be picked up. Lovejoy paid him $1,000 upfront and would give him another $1,000 when he acquired all of the evidence against Mulvihill.

After arriving at the secluded area, McDavid called Mulvihill and used the private investigator story to lure him to the area. Because he had to defecate, McDavid did so and used one of the towels to wipe himself. He placed the other towel at the base of the power pole. McDavid then positioned himself 60 feet from the power pole and waited for Mulvihill to arrive. McDavid realized that he would not be able to videotape Mulvihill picking up the evidence because Mulvihill would notice the light from McDavid's cell phone as it was recording.

About 20 minutes later, Mulvihill arrived with Kovach. Mulvihill was holding a flashlight and scanning the area with it as he and Kovach walked toward the power pole. McDavid testified that the flashlight gave Mulvihill a tactical advantage. Nevertheless, McDavid said that he could see Mulvihill sufficiently so that he could have shot him then, if he had wanted to. Mulvihill shined his flashlight directly onto McDavid and said, "hello." McDavid did not move. According to McDavid, Mulvihill then said, "I've got a gun." McDavid decided to shoot at the flashlight to remove Mulvihill's tactical advantage. Although he could have killed Mulvihill by firing two shots at his center mass, McDavid testified that he decided not to do so because "killing is not always the answer." McDavid testified that he did not intend to kill Mulvihill. However, when Mulvihill said he had a gun, McDavid feared for his life. McDavid shot at Mulvihill's flashlight. McDavid then fired six shots into the air and stopped shooting after Mulvihill and Kovach ran away. McDavid believed that his shot hit the flashlight and did not realize until later that he had shot Mulvihill.

McDavid testified that he would not miss a man-sized target if he tried to shoot it, even if the target was 100 yards away. If he wanted to kill a person who was 100 yards away, he could hit them at their center mass with no problem and there would be no reason for him to wait until the person was only 60 feet away.

Lovejoy did not present any evidence in her defense.

In rebuttal, the prosecution presented the testimony of Carlsbad Police Department Sergeant Greg White, a firearms specialist. White testified that if McDavid were truly aiming at Mulvihill's flashlight, he would expect that McDavid may have hit Mulvihill's hand, but not his armpit, because McDavid was such a skilled shooter. White believed that McDavid's shot went toward Mulvihill's center mass as McDavid intended, but it struck Mulvihill in his

/////

8

3:22-cv-0267-L-GC

armpit instead because Mulvihill rotated his body to run after seeing McDavid.

(ECF No. 51-38 at 3–15.)

### III.   PROCEDURAL HISTORY

On November 13, 2017, a jury found Petitioner guilty of conspiracy to commit murder (Cal. Penal Code § 182(a)(1)) and attempted murder (Cal. Penal Code §§ 664, 187(a)(1)). (ECF No. 51-5, Clerk's Tr., vol. 2 at 378–79. The jury also found true that Lovejoy was vicariously armed with a firearm as to each count (Cal. Penal Code § 12022(a)(1)) and that Lovejoy acted willfully, deliberately and with premedication (Cal. Penal Code § 189). (ECF No. 51-5, Clerk's Tr., vol. 2 at 378–79.) On January 31, 2018, the court sentenced Lovejoy to an indeterminate term of 25 years to life on count 1 and a consecutive one-year term for the related enhancement pursuant to Cal. Penal Code § 12022(a)(1), for a total term of 26 years to life in prison. (ECF No. 51-7, Clerk's Tr., vol. 3 at 747–48.) The court also imposed, but pursuant to Cal. Penal Code § 654 stayed execution of, an indeterminate term of 25 years to life on count 2 and related and the one-year enhancement under Cal. Penal Code § 12022(a)(1). (ECF No. 51-7, Clerk's Tr., vol. 3 at 747–48.)

Lovejoy appealed her conviction to the California Court of Appeal, arguing (1) the prosecutor committed misconduct during closing argument, (2) she was denied her Sixth Amendment right to counsel, and (3) a recent change in California law required Lovejoy's conviction for attempted murder to be reversed. (*See* ECF 51-35.) On July 28, 2020, the appellate court affirmed Lovejoy's conviction and sentence in a reasoned opinion. (*See* ECF No. 51-38.) Lovejoy then filed a petition for review with the California Supreme Court, raising the same claims she had in the appellate court. (ECF No. 51-39.) The state supreme court denied the petition for review without comment or citation on September 30, 2020. (ECF No. 51-40.)

On February 4, 2022, Lovejoy filed a Petition for Writ of Habeas Corpus in this Court, pursuant to 28 U.S.C. § 2254. (ECF No. 1.) On the same day, Lovejoy also filed

Motion to Stay the Petition and Hold it in Abeyance. (ECF No. 2.) On August 18, 2022, the Court granted Lovejoy's stay motion to allow her to exhaust additional claims in the state courts. (ECF No. 9.)

In the meantime, the California Legislature extended relief to defendants convicted of attempted murder based on the natural and probable consequences doctrine. (Sen. Bill No. 775 (2021–2022 Reg. Sess.), ch. 551 § 1, eff. Jan. 1, 2022.) In light of the change in law, Lovejoy filed a petition for resentencing in San Diego Superior Court, pursuant to Cal. Penal Code § 1172.6,[2] arguing the new law required her convictions to be set aside. The superior court denied the petition.[3] On September 20, 2022, Lovejoy appealed the denial to the state appellate court, which affirmed the lower court's decision on May 24, 2024. *See People v. Lovejoy*, 101 Cal. App. 5th 860 (Cal. Ct. App. 2024). Lovejoy then filed a petition for review in the California Supreme Court which was denied without comment or citation on July 24, 2024. *See People v. Lovejoy*, No. S285447 (Cal. July 14, 2024).[4]

On December 24, 2024, Lovejoy filed a petition for writ of habeas corpus in the California Supreme Court, raising eleven claims. (ECF No. 51-41.) The court denied the petition without comment or citation on May 14, 2025. (ECF No. 51-42.)

On May 15, 2025, this Court lifted the stay of Lovejoy's federal habeas action (*see* ECF No. 44) and on July 25, 2025, Lovejoy filed a First Amended Petition and exhibits.

---

[2] Formerly Cal. Penal Code § 1170.95.

[3] Neither Petitioner nor Respondent lodged the petition or the superior court's order denying the petition for resentencing as part of the federal habeas record but it is referenced in the published opinion of the appellate court affirming the superior court's decision. *See People v. Lovejoy*, 101 Cal. App. 5th 860 (Cal. Ct. App. 2024).

[4] While the parties also failed to lodge this portion of the state court record, the docket can be found at the California Courts Case Information website. *See* https://appellatecases.courtinfo.ca.gov/search/case/ dockets.cfm?dist=0&doc_ id=3091756&doc_no=S285447&request_token=NiIwLSEnPkw6WyBFSSFdWEpIMEQ 0UDxTKyNOVz5SQCAgCg%3D%3D  (visited May 8, 2026).

(ECF Nos. 48, 48-1.) On September 24, 2025, Respondent filed an Answer and Memorandum of Points and Authorities in support thereof. (ECF Nos. 50, 50-1.) Lovejoy filed a Traverse on November 10, 2025. (ECF No. 52.)

## IV.    SCOPE OF REVIEW

Lovejoy's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

A court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable."

3:22-cv-0267-L-GC

*See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

## V.    DISCUSSION

Lovejoy raises the following eleven claims in her FAP:

(1) The prosecutor committed misconduct during closing arguments in violation of her right to due process;

/ / / / /

(2) Trial counsel was ineffective in failing to present evidence during trial that Lovejoy could not benefit monetarily from the death of Mulvihill, in violation of her Sixth Amendment right to counsel;

(3) A change in California state law requires Lovejoy's conviction for attempted murder be set aside;

(4) Trial counsel was ineffective in failing to timely request a curative instruction regarding the effect Mulvihill's death would have on Lovejoy's obligation to pay the divorce settlement;

(5) Trial counsel was ineffective in failing to get in writing the prosecutor's agreement not to present financial gain as a possible motive;

(6) Trial counsel was ineffective when he failed to timely object to prosecutorial misconduct during rebuttal argument;

(7) Lovejoy's right to due process was violated when the trial court "misapplied California Probate law" in denying Lovejoy's request to correct the purportedly improper rebuttal argument;

(8) Lovejoy's right to due process was violated and she was deprived of a state-created liberty interest when the trial court misapplied California probate law in denying defense counsel's request for correction of the prosecutor's closing argument;

(9) Petitioner's right to due process was violated when she was not considered for mental health diversions as opposed to a state prison sentence;

(10) Lovejoy's conviction for attempted murder has been rendered invalid under California state law and thus her conviction violates her right to due process; and

(11) Lovejoy's conviction for conspiracy to commit murder was rendered invalid under a new California state law and as such her conviction violates her right to due process. (*See* FAP at 4–8.)

Petitioner has now withdrawn Ground Nine. (*See id.* at 7, 91; ECF No. 52 at 16). The Court, however, will reference the grounds for relief as originally enumerated in the FAP and group similar grounds together in the discussion below for the sake of clarity.

3:22-cv-0267-L-GC

A.      **Prosecutorial Misconduct (Ground One)**

In her first ground for relief, Lovejoy argues her right to due process was violated when the prosecutor committed misconduct during closing arguments by referencing the $120,000 settlement Lovejoy was required to pay Mulvihill on September 25, 2016 as one possible motive for the crime. (*See* FAP at 37–70.) Respondent contends the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established law. (*See* ECF No. 50-1 at 15–16.)

*1.      State Court Decision*

Lovejoy raised this claim in her petition for review to the California Supreme Court, and it was denied without comment or citation. (*See* ECF No. 51-40.) This Court therefore looks through the supreme court's silent denial to the opinion of the California Court of Appeal. *See Ylst*, 501 U.S. at 805–06. The appellate court summarized the factual background and then denied the claim on the merits as follows:

> During trial, there was evidence admitted showing that on June 26, 2016, Lovejoy and Mulvihill entered into a marital settlement agreement as part of their divorce. Pursuant to the settlement agreement, Lovejoy was obligated to pay Mulvihill a community property equalization payment of $120,000 by September 25, 2016 (i.e., 90 days after the date of the agreement), from either refinancing their community residence or from the proceeds of the sale of a condominium unit separately owned by Lovejoy.

> During the prosecutor's initial closing argument, the prosecutor discussed Lovejoy's possible motives for wanting Mulvihill dead. First, the prosecutor discussed the marital acrimony between Lovejoy and Mulvihill that began in 2014 and Lovejoy's false accusations against Mulvihill that initially allowed her to obtain sole custody of their son and required Mulvihill to pay her child support. The prosecutor described how Mulvihill ultimately prevailed by refuting Lovejoy's false accusations and that Lovejoy was thereafter required to share custody of their son with Mulvihill and pay him child support.

> The prosecutor also twice referred to Lovejoy's $120,000 obligation in her initial closing, arguing first: "And the worst insult of it all is at the end of their divorce, she has to give him $120,000. [¶] We know that none of this was satisfactory to Ms. Lovejoy because she set about looking for someone

that would kill Mr. Mulvihill and get rid of all of her woes." The prosecutor later posed to the jury the question whether Lovejoy knew that McDavid intended to kill Mulvihill and answered that question, arguing: "Well, of course. He's doing it on her behalf." The prosecutor then argued that McDavid had "nothing personal against Mr. Mulvihill. He's doing it because—probably for 120,000 reasons he's doing it and because of his sexual relationship with her."

During her initial closing argument, the prosecutor also generally described how the evidence showed that Lovejoy and McDavid had planned the killing of Mulvihill, found a secluded location, and used a "burner phone" to lure Mulvihill to the location where McDavid shot him.

Lovejoy's attorney did not object to any of the references that the prosecutor made to the $120,000 payment in her initial closing argument.

In his closing argument, Lovejoy's counsel argued that Lovejoy and McDavid had no motive to kill Mulvihill because neither one had any significant financial pressures. Her counsel also argued that the testimony of Clark, Lovejoy's aunt, showed that about three weeks before the shooting, Lovejoy was happy about her marital settlement agreement and how cooperative Mulvihill had been. Lovejoy's counsel also described how Lovejoy would have to pay Mulvihill the settlement amount in 90 days and noted that she had accepted an offer on the sale of her condominium that would close by the end of September. Lovejoy's counsel addressed CALCRIM No. 370 regarding motive as a factor for the jury's consideration, arguing: "Having a motive may be a factor tending to show a defendant is guilty. Not having a motive may be a factor tending to show a defendant is not guilty." He argued: "You, as jurors, need to look at the progression of things from December [2015] to September 2016. And when you look at the uncontradicted facts of everything that has gone on during that time, there is 100 percent no motive to murder Mr. Mulvihill."

In rebuttal closing argument, the prosecutor responded to the argument by Lovejoy's counsel that Lovejoy and McDavid had no motive to kill Mulvihill, referring three times to Lovejoy's obligation to pay $120,000 to Mulvihill. First, the prosecutor argued that the evidence showed that Lovejoy was not, in fact, happy with the settlement agreement. The prosecutor reasoned that if Lovejoy were truly happy and the jury were to accept her version of events, she would not have hired McDavid to try to find evidence about Mulvihill molesting their son. The prosecutor argued: "It is still obvious

15

that she's . . . not at all happy with the way the settlement is coming down. And there is urgency to do this crime now because you can't do it right on the eve of the $120,000. So it's got to be at least somewhat removed in time. And that's why that date was selected."

Second, the prosecutor argued that McDavid's testimony that he spontaneously selected September 1, 2016, as the date to lure Mulvihill to the secluded location was not credible. She argued: "Really, why did you go there the day before? He testified that he went to the scene the day before. If this was a spontaneous thing, why did you go the day before?" The prosecutor answered her own question, arguing: "The $120,000 payment. He wants you to think is irrelevant? That is obviously not true."

Third, countering the argument by Lovejoy's counsel that Lovejoy and McDavid had no motive to kill Mulvihill, the prosecutor argued: "No reason to kill[?] They had 120,000 reasons to kill." Neither Lovejoy's nor McDavid's counsel objected to any of the remarks that the prosecutor made about the $120,000 payment during her rebuttal closing argument.

On Thursday, November 9, 2017, jury deliberations began and continued for about one hour. Jury deliberations resumed the following Monday, November 13. Shortly after deliberations resumed, Lovejoy's counsel objected to the prosecutor's rebuttal closing argument that Lovejoy had a $120,000 motive to kill Mulvihill based on the marital settlement agreement. Stating that he had been taken by surprise by that argument, Lovejoy's counsel asked the court to reopen the case so that he could present additional evidence, and requested that the court either take judicial notice that the settlement agreement was binding on all parties, or instruct the jury that the prosecutor's argument concerning the $120,000 was not accurate or supported by law. He argued that because the marital settlement agreement was enforceable, Lovejoy "wasn't in a position to gain that $120,000 back." By so arguing, Lovejoy's counsel was presumably making the point that even if Mulvihill died, Lovejoy nevertheless would be obligated to make the payment to Mulvihill's estate.

The court explained that, in its view, the money would have gone to their child if Mulvihill had died, but that Lovejoy would have had control of it as his mother. The court stated: "If [Lovejoy's] intent was to have [Mulvihill] killed, then that money which goes to Mr. Mulvihill's estate goes to the child. And she's the child's mother and guardian, so she has control over that. [¶] ... [I]t's a distinction without a real difference in the idea of a

16

motive.... [I]t just would confuse the jury to bring in something that would not have a major impact on them." The court therefore denied the relief requested by Lovejoy's counsel. The jury returned its verdicts shortly thereafter, finding Lovejoy guilty on counts 1 and 2.

Lovejoy filed a motion for new trial, asserting that the prosecutor had improperly argued in rebuttal closing a new theory of a monetary or "debt-avoidance" motive by the defendants—a theory that, according to the motion, the prosecutor had represented prior to trial that she would not raise. The prosecutor opposed the motion, arguing, inter alia, that she had simply argued in closing that Lovejoy did not want to give the money to Mulvihill because she despised him and therefore, new testimony by a family law attorney regarding the financial impact of the marital settlement agreement would not have changed anything. The court rejected Lovejoy's assertion that the prosecutor had represented that she would not assert the $120,000 payment, as required by the marital settlement agreement, as a motive. The court noted that the entire marital settlement agreement was in evidence, including its provision that Lovejoy was obligated to make the $120,000 equalization payment. The court rejected Lovejoy's assertion that the prosecutor had disavowed until her rebuttal closing argument that she would assert the $120,000 equalization payment as a motive, noting that the prosecutor had raised that issue prior to trial, presented the settlement agreement, including its $120,000 equalization payment provision, as evidence during the trial, and cross-examined McDavid about the $120,000 payment that Lovejoy was obligated to make to Mulvihill. Accordingly, the court denied Lovejoy's motion for new trial.

Assuming arguendo that Lovejoy did not forfeit this claim by her counsel's failure to timely object and request a curative admonition, we reject Lovejoy's argument on appeal that the prosecutor argued one motive theory, "debt animosity," in her initial closing argument and a different motive theory, "debt avoidance," in her rebuttal closing, with respect to the $120,000 equalization payment. [Footnote 11: Lovejoy does not challenge on appeal the prosecutor's remarks in her initial closing arguments that, according to Lovejoy, suggested that Lovejoy had a "debt animosity" motive to kill Mulvihill, i.e., that she conspired and attempted to kill Mulvihill because "she was so angry at having to pay money to Mulvihill that she wanted him killed." Rather, her contention on appeal is that the prosecutor changed her theory with respect to Lovejoy's motive for wanting Mulvihill dead from a "debt animosity" theory discussed in the prosecutor's initial closing argument, to a "debt avoidance" theory, i.e., that Lovejoy would gain financially if Mulvihill

3:22-cv-0267-L-GC

were dead because she would not have to pay him the $120,000, purportedly argued in the prosecutor's rebuttal closing argument (a theory that Lovejoy contends is unsupported factually or legally), thereby depriving Lovejoy's counsel of the opportunity to respond to the "debt avoidance" argument.]

We glean from Lovejoy's briefing on appeal that the prosecutor's purported "debt animosity" motive theory, argued in her initial closing argument, was that because Lovejoy was angry that she had to pay the $120,000 equalization amount specifically to Mulvihill by the end of September 2016, she wanted Mulvihill killed before that date. The "debt avoidance" motive theory, purportedly argued in rebuttal closing argument, is that Lovejoy wanted Mulvihill dead because she wanted to avoid paying the $120,000 and instead, keep that money for herself, thereby having a motive of financial gain.

Contrary to Lovejoy's assertion on appeal, the prosecutor's references in her rebuttal closing argument to the $120,000 payment, as quoted *ante*, do *not* show that the prosecutor changed her motive theory with respect to the $120,000 payment from a "debt animosity" motive to a "debt avoidance" motive. Rather, the references in the prosecutor's rebuttal argument to the $120,000 payment are consistent with the prosecutor's initial argument with respect to Lovejoy's motives. As the People assert, with respect to the $120,000 payment, the prosecutor consistently argued at trial that Lovejoy's having to make the $120,000 payment *to Mulvihill* provided a motive for her to want Mulvihill dead. As discussed *ante*, in her initial closing argument, the prosecutor referred to Lovejoy's anger about having to pay Mulvihill the $120,000, arguing: "And the worst insult of it all is at the end of their divorce, *she has to give him $120,000.* [¶] We know that none of this was satisfactory to Ms. Lovejoy because she set about looking for someone that would kill Mr. Mulvihill and get rid of all of her woes." (Italics added.) In addressing McDavid's motive to kill Mulvihill, the prosecutor again referred to the $120,000 amount, arguing: "He's doing it on her behalf" and "has nothing personal against Mr. Mulvihill. He's doing it because—probably *for 120,000 reasons* he's doing it and because of his sexual relationship with her." (Italics added.)

In rebuttal closing argument, the prosecutor's references to the $120,000 amount did not vary from the prosecutor's theory argued in her initial closing argument. Countering the closing argument by Lovejoy's counsel that Lovejoy was happy with her marital settlement agreement with Mulvihill, the prosecutor in rebuttal closing argued that the evidence showed

3:22-cv-0267-L-GC

that Lovejoy was not, in fact, happy with the settlement agreement. The prosecutor further argued that because Lovejoy was not happy with the agreement, "there is urgency to do this crime now because you can't do it right *on the eve of the $120,000*. So it's got to be at least somewhat removed in time. And that's why that date was selected." (Italics added.) In context, the prosecutor's reference to the $120,000 payment addressed the timing of the attempted murder and not Lovejoy's motive, directly. The prosecutor argued, in effect, that because Lovejoy was angry about having to pay Mulvihill the $120,000 amount and intended to kill him based on that anger, she had to kill him at a time when it would not so obviously connect her with the killing. Accordingly, that reference by the prosecutor to the $120,000 payment was consistent with her initial closing argument and does not demonstrate a change from a "debt animosity" motive theory to a "debt avoidance" motive theory, as Lovejoy maintains.

The prosecutor later argued in rebuttal closing that McDavid's testimony that he had spontaneously selected September 1, 2016, as the date to lure Mulvihill to the secluded location was not credible, noting that the evidence showed that McDavid had gone to the secluded location on the day before the shooting. In particular, the prosecutor argued that the fact that McDavid went to the location on the day before the shooting, and "[t]he *$120,000 payment*," demonstrated that McDavid had not spontaneously picked September 1 as the date to shoot Mulvihill. (Italics added.) By so referring to the $120,000 payment, the prosecutor, in effect, incorporated into her rebuttal argument the comments that she made in her initial closing argument, discussed *ante*, in which she argued that McDavid intended to kill Mulvihill based on his relationship with Lovejoy.

In the prosecutor's third and final reference to the $120,000 amount in her rebuttal closing, the prosecutor again countered the argument by Lovejoy's counsel that there was no motive for Lovejoy and McDavid to kill Mulvihill, arguing: "No reason to kill[?] They had *120,000 reasons to kill*." (Italics added.) Thus, the prosecutor argued in both her initial closing argument and in her rebuttal closing argument, that, in effect, because Lovejoy was angry about having to pay Mulvihill the $120,000 amount, she had "120,000 reasons to kill" him. At no point in her closing arguments did the prosecutor argue to the jury that if Mulvihill were killed, Lovejoy would have been able to keep the $120,000 for herself.

Again, contrary to Lovejoy's assertion, none of the above references by the prosecutor to the $120,000 payment demonstrates that the prosecutor

3:22-cv-0267-L-GC

changed her theory regarding the $120,000 payment from her initial closing argument to her rebuttal closing, or that the prosecutor added a "debt avoidance" theory to a "debt animosity" theory. The trial judge, who was present through the entire trial and heard all of the evidence and arguments of counsel, rejected Lovejoy's argument that the prosecutor had unfairly surprised Lovejoy's counsel at trial through her remarks about the $120,000 payment made during her rebuttal closing.

The prosecutor fairly responded to the argument by Lovejoy's counsel that Lovejoy was happy with the martial settlement agreement and therefore, had no motive to kill Mulvihill, by arguing in her rebuttal closing that the evidence showed that Lovejoy, in fact, had a motive to kill Mulvihill, i.e., she was angry about having to pay Mulvihill the $120,000. (*Sassounian*, *supra*, 182 Cal.App.3d at p. 396 [prosecutor may fairly comment on the evidence]; *Young*, *supra*, 34 Cal.4th at p. 1192 [prosecutor may fairly respond to defense counsel's arguments].) Because we must consider the prosecutor's arguments in the context in which they are made (*Gonzalez*, *supra*, 51 Cal.3d at p. 1224, fn. 21), and view the prosecutor's arguments as a whole, we cannot consider the prosecutor's references to the $120,000 payment in isolation and instead, consider them as part of the prosecutor's entire closing argument. (*Dennis*, *supra*, 17 Cal.4th at p. 522; *Lucas*, *supra*, 12 Cal.4th at p. 475.) Considering the prosecutor's arguments as a whole, we conclude that her references in her rebuttal closing to the $120,000 payment are consistent with her comments in her initial closing and did not, as Lovejoy asserts, constitute a change in the prosecution's theory regarding Lovejoy's motive. [Footnote 12 omitted].

(ECF No. 51-38 at 3–13.)

### 2.   *Clearly Established Law*

Prosecutorial misconduct is cognizable on federal habeas corpus, but "the appropriate standard of review for such a claim . . . is the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). A defendant's due process rights are violated only when a prosecutor's misconduct renders a trial fundamentally unfair. *Id*.; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) (noting that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

3:22-cv-0267-L-GC

Regarding statements made during closing arguments, under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct "infected the trial with unfairness." *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). In determining if the conduct rendered the trial fundamentally unfair, courts must evaluate a prosecutorial misconduct claim by "examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation marks omitted). And even where a prosecutor's conduct renders a trial fundamentally unfair, federal habeas relief is in order only if the denial of due process based on prosecutorial misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

### 3.    *Analysis*

The state appellate court's denial of Lovejoy's prosecutorial misconduct claim was neither contrary to, nor an unreasonable application of, clearly established law.[5] First, as the appellate court found after considering the comments in context, the prosecutor's references to the settlement during closing and rebuttal argument did not amount to improper argument. A prosecutor is permitted to argue reasonable inferences from the evidence. *Duckett v. Godinez*, 67 F.3d 734, 742 (9th Cir. 1995). Specifically, the Ninth Circuit has stated that during closing arguments, a prosecutor is permitted "wide latitude" to argue reasonable inferences from the evidence. *Fields v. Brown*, 431 F.3d 1186, 1206 (9th Cir. 2005); *Ceja v. Stewart*, 97 F.3d 1246, 1253–54 (9th Cir. 1996) ("Counsel are given latitude in the presentation of their closing arguments, and courts must allow the

/ / / / /

---

[5] The Court notes Petitioner does not argue the appellate court's decision was contrary to, or an unreasonable application of, clearly established federal law; but instead focuses on the purported error(s) of the trial court. (*See e.g.*, FAP at 50–66.)

prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom.").

Here, as the state appellate court found, the prosecutor's references to the money flowed from reasonable inferences based on the evidence presented. The prosecutor noted Lovejoy and Mulvihill had been embroiled in a lengthy and highly acrimonious divorce. And she argued Lovejoy was unhappy with the settlement and resented, among other things, having to share custody of her son 50/50, having to pay $120,000 to Mulvihill, and having to pay Mulvihill child support. (*See* ECF No., Rep.'s Tr., vol. 14 51-28 at 2011.) As the state appellate court also noted, the prosecutor never argued that Lovejoy's obligation to pay the settlement would be summarily lifted if Mulvihill died before the payment was due. She argued Lovejoy did not want to pay the money *to* Mulvihill. (*See id*.) While the prosecutor's references to the $120,000 settlement obligation during rebuttal argument may have been somewhat imprecise, a federal court should not presume that an ambiguous comment was intended to have its most damaging meaning or that the jury necessarily drew such a damaging interpretation. *Donnelly*, 416 U.S. at 647. ("A court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.").

As noted above, to show a state court's decision was based on an unreasonable application of clearly established law, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Lovejoy has failed to meet that high standard. In sum, the state appellate court's conclusion that the prosecutor's references to the $120,000 payment in rebuttal argument were not improper based on the evidence presented, was not an unreasonable application of clearly established law.

Because the state court reasonably concluded there was no improper argument, the analysis could end here. But even assuming the prosecutor's comments during rebuttal

argument were improper, Lovejoy would still not be entitled to federal habeas relief. "Improper argument does not, per se, violate a defendant's constitutional rights." *Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir. 1996) (quoting *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993)). Instead, the alleged misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Even if a prosecutor's argument is egregiously improper, a federal court cannot grant habeas relief unless "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Thompson*, 74 F.3d at 1576 (quoting *Darden*, 477 U.S. at 181).

Petitioner as not shown the purported misconduct rendered her trial fundamentally unfair. As noted above, determining whether prosecutorial misconduct occurred during closing argument requires an examination of the entire proceedings so that the prosecutor's remarks may be placed in proper context. *Boyde v. California*, 494 U.S. 370, 384–85 (1990); *Allen v. Woodford*, 395 F.3d 979, 1010 (9th Cir. 2005). Viewing the purportedly improper rebuttal comments in context, the prosecutor was responding to defense counsel's argument during closing that Lovejoy had "100 percent no motive to kill" Mulvihill and that she was "happy" with the divorce settlement. (ECF No. 51-28, Rep. Tr., vol. 14 at 2063, 2064–65.) The prosecutor stated that Lovejoy's other actions suggested she was not happy with the divorce settlement, because of the payment, and a number of other reasons. She noted that Lovejoy had wanted sole custody of their son but the settlement called for 50/50 custody. (*Id.* at 2010–11.) Lovejoy had gone as far as bringing false allegations of abuse against Mulvihill in an ultimately failed attempt to deprive Mulvihill of any visitation. (*Id.*) The prosecutor noted that if Lovejoy was "happy" with the situation, she would not have sought to pay McDavid $2,000 to allegedly dig up dirt on Mulvihill. (*Id.* at 2078–79.) While the prosecutor's statement during rebuttal regarding "120,000 reasons" could be interpreted to suggest Lovejoy sought to save herself from having to make the settlement payment, in context of the argument as a whole, it was simply an argument that

evidence showed that Lovejoy was dissatisfied with the divorce proceedings in general, including the settlement. (*See id.* at 2092.)

In addition, even assuming the argument was imprecise, the court instructed the jury that statements made by attorneys during opening and closing arguments are not evidence, and the trial judge specifically reminded the jurors of this just before both opening and closing arguments. (ECF No. 51-21, Rep. Tr., vol. 7 at 692; ECF No. 51-28, Rep. Tr., vol. 14 at 1963, 2009; *see also* ECF No. 51-2, Clerk's Tr., vol. 2 at 305, CALCRIM No. 222.) The jury is presumed to have followed these instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting "the almost invariable assumption of the law that jurors follow their instructions"). Viewed in context of the two-week trial, the brief comments, included in over 45 pages of closing argument transcript, did not render Lovejoy's trial fundamentally unfair. *See Hall v. Whitley*, 935 F.2d 164, 165–66 (9th Cir. 1991) (per curiam) (concluding a prosecutor's comments did not render petitioner's trial fundamentally unfair where the comments consisted of isolated moments in three-day trial and the trial court instructed that arguments were not evidence); *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (rejecting prosecutorial misconduct claim in part because court had instructed jury that attorneys' statements were not evidence) *see also Harrell v. Addison*, No. 3:21-cv-0255-RBM-AHG, 2022 WL 1292142, at *24 (S.D. Cal. Apr. 29, 2022) (concluding prosecutor's misstatement during closing argument did not deprive petitioner of fair trial when misstatement "was an isolated comment during a lengthy a closing argument," which spanned forty-five pages of trial transcript); *Gonzalez v. Guzman*, No. 5:23-cv-00334-HDV-KES, 2023 WL 7391687, at *16 (C.D. Cal. Sept. 12, 2023) (same when prosecutor's improper comments consisted of "only five sentences" of closing argument that "spanned nineteen pages of Reporter's Transcript"), accepted by 2023 WL 7388879 (C.D. Cal. Nov. 8, 2023). Therefore, even assuming improper argument, it did not amount to a violation of due process.

/ / / / /

Lastly, Lovejoy cannot show any purported misconduct had a "substantial and injurious effect or influence in determining the jury's verdict."[6] *Brecht*, 507 U.S. at 63; *see also see Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir. 2002) ("If prosecutorial misconduct is established, and it was constitutional error, we then apply the *Brecht* harmless error test."). Under *Brecht*, the question is "whether a federal habeas court itself harbors grave doubt about the petitioner's verdict." *Brown v. Davenport*, 596 U.S. 118, 136 (2022). First, the Court notes that to the extent Petitioner points to media statements by a juror after trial, stating: "I believed the $120,000 was playing into it," the Court may not consider such post-verdict comments by jurors. *See Fields*, 503 F.3d at 778 (stating that "juror testimony about the subjective effect of evidence on the particular juror or about the deliberative process may not" be considered by federal courts on habeas review).

Moreover, given the strong evidence against Lovejoy, she cannot show any error had a substantially injurious effect on the jury's verdict. Lovejoy's aunt testified that Lovejoy had asked for her help in finding someone to kill Mulvihill. (ECF No. 51-23, Rep. Tr., vol. 9 at 1159–60, 1165–66.) Evidence showed that when her aunt failed to assist her, Lovejoy turned to McDavid. The jury saw photographs and video of Lovejoy purchasing a burner phone two weeks before the shooting. (ECF No. 51-21, Rep. Tr., vol. 7 at 767–68, 776.) That same phone was used by McDavid to call Mulvihill the night of the shooting. (ECF No. 51-22, Rep. Tr., vol. 8 at 850; ECF No. 51-24, Rep. Tr., vol. 10 at 1312.) Lovejoy dropped McDavid off at the area where he planned to lure Mulvihill and she picked McDavid up nearby after the shooting. (ECF No. 51-25, Rep. Tr., vol. 11 at 1584; ECF

---

[6] Lovejoy argues she was "prejudiced" by the prosecutor's comments because there was a "reasonable likelihood that the jury construed or applied any of the complained—of remarks in an objectionable fashion." (FAP at 70 (citing *People v. Morales*, 25 Cal. 4th 34, 44 (Cal. 2001)). But that is not the standard on federal habeas the standard. *See Bains v. Cambra*, 204 F.3d 764, 977 (9th Cir. 2000) (holding that the federal court "should apply the *Brecht* standard when conducting their own independent harmless error review, regardless of what, if any, type of harmless error review was conducted by the state courts").

25

No. 51-26, Rep. Tr., vol. 12 at 1643–44.) When Lovejoy dropped McDavid off, he was carrying a bag containing his rifle. (ECF No. 51-25, Rep. Tr., vol. 11 at 1583–84.) Finally, a search of Lovejoy's computer showed that prior to the shooting, she had searched for the next "new moon." (ECF No. 51-24, Rep. Tr., vol. 10 at 1300–01.) The night of the shooting there was a new moon, making the night sky darker. (ECF No. 51-23, Rep. Tr., vol. 9 at 1126.) Given the evidence, even assuming arguendo that the prosecutor's comments in closing argument were improper, Lovejoy has not shown the comments had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 63.

In sum, the Court finds the state appellate court's denial of this claim was neither contrary to, nor an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d). Therefore, Lovejoy is not entitled to relief as to this claim.

**B.    Failure to Correct Improper Argument (Grounds Seven and Eight)**

In Grounds Seven and Eight, Petitioner raises similar claims to each other and to Ground One discussed above. In Ground Seven Lovejoy argues:

> Petitioner was denied her 14th Amendment right to Due Process and a fair trial when the trial court misapplied California probate law in denying Petitioner's request to correct the prosecutor's improper and incorrect closing argument.

(FAP at 89.) And in Ground Eight, she contends:

> Petitioner was denied her 14th Amendment right to Due Process and a fair trial and deprived of a state created liberty interest when the trial court misapplied California probate law in refusing Petitioner's request for correction of the prosecutor's improper closing argument.

(*Id.* at 90.)  Essentially the only difference between these two claims is the reference to a "state created liberty interest" in Ground Eight. In both grounds, however, Lovejoy appears to argue trial court's refusal to reopen evidence after the jury began deliberations, provide additional jury instructions, or grant a motion for new trial based on the prosecutor's purportedly improper argument, amounted to a denial of her right to due process. (*Id.* at

3:22-cv-0267-L-GC

90–91.) But, as discussed above, the state appellate court reasonably concluded the prosecutor's argument was not improper.

In the last reasoned state court decision, the appellate court briefly addressed these claims in a footnote, stating:

> Because, as we concluded *ante*, the prosecutor's theory regarding Lovejoy's motive with respect to the $120,000 payment was consistent throughout her closing arguments, we need not, and do not, address the trial court's reasoning for its denial during jury deliberations of Lovejoy's requested relief (e.g., reopening the case to permit defense counsel to present evidence on her lack of a financial gain motive) or the court's denial of her motion for new trial or the prosecutor's arguments in opposing her requested relief and motion for new trial. Regardless of the trial court's reasons for its rulings during jury deliberations and in denying Lovejoy's motion for new trial, we conclude that the court correctly denied her requested relief because the prosecutor's references to the $120,000 payment were consistent throughout. (*People v. Jones* (2012) 54 Cal.4th 1, 50 [appellate court must affirm trial court's correct ruling even if its reasons were incorrect].) Further, Lovejoy has not persuaded us that the trial court abused its discretion by not reopening the case during jury deliberations to allow her to present evidence of her purported lack of a financial gain motive. As noted, Lovejoy's counsel argued in closing that Lovejoy and McDavid had no motive to kill Mulvihill because neither one had any significant financial pressures. The court could have concluded that Lovejoy's counsel's request was made too late in the proceedings (i.e., in the midst of jury deliberations), that she had not been diligent in presenting that evidence during trial, that the jury may be confused by that evidence and/or give it undue emphasis, and/or that the evidence that Lovejoy wanted to present would not have a significant impact on the jury's consideration of the case. (*People v. Jones* (2003) 30 Cal.4th 1084, 1111; *People v. Masters* (2016) 62 Cal.4th 1019, 1069.)

(ECF No. 51-38 at 65, fn 12.)

In short, the appellate court reasonably found there was no need for the trial court to reopen evidence or instruct the jury on probate law because it had already reasonably concluded there was no improper argument. Furthermore, the denial of the motion for new

/ / / / /

trial does not implicate a "state created liberty interest."[7] Therefore, because there was no improper argument to correct, Lovejoy cannot show her trial was rendered fundamentally unfair by the trial court's refusal to reopen evidence, further instruct the jury after it had already begun deliberations, or grant a new trial. As such, the state court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established law; nor was it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Lovejoy is not entitled to relief as to Grounds Seven and Eight.

## C.     Ineffective Assistance of Counsel (Grounds Two, Four, Five, and Six)

Lovejoy raises several grounds for relief based on ineffective assistance of trial counsel. She argues counsel was ineffective in (1) failing to present evidence that Lovejoy would not benefit financially from the death of Mulvihill (Ground Two); (2) failing to promptly object to the prosecutor's rebuttal argument (Ground Four); (3) failing to obtain "in writing" an agreement from the prosecutor that she did not intend to argue "financial motive" (Ground Five); and failing to request a curative jury instruction after the prosecutor's comments during closing (Ground Six). (*See* FAP at 72–74, 86–88.)

/ / / / /

---

[7] When "a State creates a liberty interest, the Due Process Clause requires fair procedures for its vindication— and federal courts will review the application of those constitutionally required procedures." *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011). California courts, however, have not held that the state has created a liberty interest from the rules governing a motion for new trial. *See People v. Davis*, 10 Cal.4th 463, 524 n.22 (1995) (rejecting as "unpersuasive" an argument that a criminal defendant's entitlement to independent review as part of a motion for new trial creates a liberty interest); *see also People v. Moreda*, 118 Cal.App.4th 507, 514–15 (2004) (rejecting a similar argument that there is a state-created liberty interest in having a new trial motion based on insufficiency of the evidence decided by the same judge who presided over the trial). "[A] state creates a protected liberty interest by placing substantive limitations on official discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983). But California law does not require a trial court to reach any particular result in exercising its discretion in deciding a motion for new trial. *See People v. Robarge*, 41 Cal.2d 628, 633 (1953).

### *1.   Clearly Established Law*

It is clearly established that the Sixth Amendment guarantees criminal defendants the effective assistance of counsel. *See Strickland v Washington*, 466 U.S. 668 (1984). A claim of ineffective assistance of counsel has two elements: (1) "deficient performance"; and (2) "prejudice." *Id.* at 700. "Deficient performance" is "representation f[alling] below an objective standard of reasonableness." *Id*. at 688. Establishing deficient performance requires overcoming a "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 689–90. Further, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." *Id*.

"Prejudice" is established by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694; *see also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (deciding the "prejudice" component "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair"). It is unnecessary to address both *Strickland* elements if a petitioner makes an insufficient showing on one. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other.").

Where there has been a state court decision rejecting a *Strickland* claim, review is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123–24 (2009)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. Relief is available only if "there is no possibility fairminded jurists could disagree" that the state court's application of *Strickland* was incorrect. *Id*. Moreover, since "[t]he *Strickland* standard is a

29

general one, . . . the range of reasonable applications is substantial." *Id.* at 105 (citing *Knowles*, 556 U.S. at 123).

### 2. Failure to Present Evidence of Lack of Financial Motive (Ground Two)

Petitioner argues in Ground Two, that defense counsel was ineffective in failing to present evidence that Lovejoy would not benefit monetarily from Mulvihill's death. Lovejoy raised this claim on direct appeal. Because the California Supreme Court denied Lovejoy's petition for review without comment or citation (*see* ECF No. 51-39), this Court looks through to the reasoned opinion of the California Court of Appeal. *See Ylst*, 501 U.S. at 805–06. The appellate court rejected this claim, stating:

> Lovejoy alternatively argues that if the prosecutor did not err by referring in her rebuttal closing argument to the $120,000 payment, she nevertheless was denied her Sixth Amendment right to effective assistance of counsel because her trial counsel failed to present evidence in her defense case showing that she would not have gained, financially, if Mulvihill were killed. Lovejoy asserts that her primary defense theory at trial was that she did not have a motive to kill Mulvihill and her counsel had two experts in enforcement of judgments and probate law who could have testified that she could not have received any financial gain on the death of Mulvihill. In particular, she asserts that those experts could have testified that if Mulvihill had been killed, she nevertheless would have been obligated to pay the $120,000 amount to his estate and any inheritance her son received from Mulvihill's estate would likely have been under the control of a guardian or custodian other than her. Lovejoy argues that because her trial counsel failed to present that evidence, she was denied her right to effective assistance of counsel.
>
> A criminal defendant is constitutionally entitled to the effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland*, supra, 466 U.S. at pp. 684-685; *People v. Pope* (1979) 23 Cal.3d 412, 422 (*Pope*).) To establish a denial of the right to counsel, a defendant must show: (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217 (*Ledesma*); *Pope*, at p. 425.) To demonstrate prejudice, a defendant must show that there is a reasonable probability that he or she would have received a more favorable result if his or her counsel's performance had not been deficient. (Strickland, at pp. 693-694; *Ledesma*, at pp. 217-218.) "A reasonable probability is a

probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215.) It is the defendant's burden on appeal to show that he or she was denied the effective assistance of counsel and is entitled to relief. (*Ledesma*, at p. 218.)

"In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical decisions. [Citations.] ... Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.'" (*People v. Frye* (1998) 18 Cal.4th 894, 979-980.) However, a court need not address the issue of whether a defendant's counsel performed deficiently before it addresses the issue of whether the defendant was prejudiced by that purported deficient performance. "If it is easier to dispose of an ineffectiveness claim on the ground of a lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, supra, 466 U.S. at p. 697; see also *In re Alvernaz* (1992) 2 Cal.4th 924, 945.)

Assuming arguendo that Lovejoy's counsel performed deficiently, as she asserts, we nevertheless conclude that she has not carried her burden on appeal to show that such deficient performance prejudiced her. (*Strickland*, supra, 466 U.S. at pp. 687, 691-692, 697; *Ledesma*, supra, 43 Cal.3d at pp. 216-217; *Pope*, supra, 23 Cal.3d at p. 425.) Based on our review of the record, we conclude that it is not reasonably probable that Lovejoy would have obtained a more favorable result at trial if her counsel had presented the testimony of the two experts and/or other evidence showing that she would not have gained financially if Mulvihill were killed. [Footnote 13: In her opening brief, Lovejoy argues "Counsel could have called two experts in the field of enforcement of judgments and probate law and quickly disabused the jury of any notion that appellant could realize a financial gain by the death of her husband." Her "two experts" apparently were Lauren Schmidt, Lovejoy's family law attorney, and an unnamed "Wilson trust attorney that my client had contacted." The record on appeal does not contain a declaration by either expert regarding the nature and substance of their purported expert testimony."]

As the People assert, Lovejoy has not submitted declarations from the two experts demonstrating what their purported testimony would have been if they had been called to testify by her counsel. In any event, assuming that the

3:22-cv-0267-L-GC

two experts would have persuasively testified that Lovejoy would not have gained financially from Mulvihill's death, i.e., that she would not have been able to keep the $120,000 that she was required to pay him pursuant to the marital settlement agreement, we nevertheless conclude that it is not reasonably probable that she would have obtained a more favorable verdict if her counsel had presented that evidence. First, the jury was instructed with CALCRIM No. 370 that Lovejoy's motive to kill Mulvihill was not an element of the offenses charged against her. Second, the prosecutor presented evidence about, and argued the existence of, three separate possible motives that Lovejoy could have had that supported a reasonable inference by the jury that she intended to kill Mulvihill. In particular, the prosecutor argued that Lovejoy was angry because she had to share custody of her son with Mulvihill, she had to pay Mulvihill child support, and she had to pay Mulvihill a $120,000 equalization payment. The prosecutor did not argue that Lovejoy could avoid paying that amount if Mulvihill were killed.

[Footnote 14: To the extent that Lovejoy cites postverdict comments by two jurors regarding the $120,000 payment, those comments are irrelevant and do not show that Lovejoy was prejudiced by her counsel's purported deficient performance. Although we doubt that those jurors' comments have been properly made a part of the record on appeal, we nevertheless conclude that those comments do not support the interpretation that Lovejoy suggests. One juror apparently told a reporter that Lovejoy "didn't want to give $120,000 to her husband" and another juror apparently stated she personally believed "the motive was the money" and "believed $120,000 was playing into it, but I also think that she just had enough." While those comments demonstrate that these two jurors believed that Lovejoy was angry about having to pay $120,000 to Mulvihill, the comments are consistent with the prosecutor's remarks about the $120,000 made during closing arguments and do not show that the jurors believed that Lovejoy would gain financially if Mulvihill were killed.]

Finally, and most importantly, based on our independent review of the record, we conclude that the evidence of Lovejoy's guilt of the two offenses is overwhelming. As discussed *ante*, Lovejoy made false accusations against Mulvihill in order to obtain sole custody of her son. After those accusations were proven to be false and Mulvihill obtained shared custody of their son and child support from Lovejoy, Lovejoy asked Clark, her aunt, whether she knew anyone who could kill Mulvihill. When Clark told Lovejoy that she did not, Lovejoy recruited McDavid, her shooting instructor and sometime sexual partner, to lure Mulvihill to a secluded location at night and use his

3:22-cv-0267-L-GC

sharpshooting skills to kill him. In executing their plan, Lovejoy researched the date on which there would be a new moon, purchased a TracFone for McDavid to use in calling Mulvihill that night, met McDavid at a parking lot and drove him to the secluded location, and picked McDavid up after the shooting. Based on that compelling evidence showing Lovejoy's direct participation in recruiting McDavid to shoot Mulvihill, planning that shooting with McDavid, and assisting McDavid in executing their plan on the night of September 1, 2016, we conclude that it is not reasonably probable that Lovejoy would have obtained a more favorable result at trial if her counsel had presented evidence that she would not have been able to keep the $120,000 that she was required to pay Mulvihill if Mulvihill were killed. Because Lovejoy was not prejudiced by her counsel's purported deficient performance, we conclude that she was not denied her constitutional right to the effective assistance of counsel. (*Strickland*, supra, 466 U.S. at pp. 687, 691-692, 697; *Ledesma*, supra, 43 Cal.3d at pp. 216-217; *Pope*, supra, 23 Cal.3d at p. 425.)

(ECF 51-38 at 65–70.)

The state court's denial of the claim was not based on an unreasonable application of *Strickland*. As the appellate court noted, even assuming defense counsel's failure to present such evidence amounted to a deficient performance, she cannot show prejudice. As discussed above, the case against Lovejoy was strong. Evidence showed longstanding acrimony between the couple, beginning with Lovejoy's allegations that Mulvihill abused their son, and Lovejoy. These accusations initially led to Mulvihill being forced to leave the home and prevented from seeing his son. After a period of supervised visits, meetings with counselors and psychologists, extensive drug testing, Lovejoy's abuse accusations against Mulvihill were determined to be unfounded. (*See e.g.*, ECF No 51-22, Rep.'s Tr., vol. 8 at 843–844.) Mulvihill was ultimately awarded 50/50 custody and Lovejoy would have to begin paying child support to Mulvihill. (*Id.* at 848–49, 881.) Thus, even without the $120,000 equalization payment, evidence showed Lovejoy was unhappy about the divorce settlement.

And crucially, as noted above, Lovejoy's aunt testified that months before the shooting, Lovejoy had asked her if she knew someone who could kill Mulvihill. (ECF No.

51-23, Rep.'s Tr., vol. 9 at 1160, 1165.) In addition, just weeks before the shooting, Lovejoy purchased the TracFone McDavid used to call Mulvihill to lure him to the site of the shooting. (ECF No. 51-21, Rep.'s Tr., vol 7 at 753–57, 765–67, 813.) Lovejoy drove McDavid to the area where the shooting took place and dropped him off. (ECF No. 51-25, Rep.'s Tr., vol. 11 at 1584.) And after the shooting, McDavid called Lovejoy and she picked McDavid up and drove him back to his car. (ECF No. 51-26, Rep.'s Tr., vol. 12 at 1643–44.) A search of Lovejoy's computer revealed that on August 6, 2016, just weeks before the shooting, she researched information about moon cycles and specifically searched for the when the next "new moon," would occur. (ECF No. 51-24, Rep.'s Tr., vol. 10 at 1300–01.) On the night of the shooting, September 1, 2026, there was a new moon, making the sky darker. (*See* ECF No. 51-23, Rep.'s Tr., vol. 9 1126.) Thus, given the strength of the evidence against her, even if counsel's performance were deficient, the appellate court reasonably concluded Lovejoy failed to show prejudice.

The state court's denial of this claim was neither contrary to, nor an unreasonable application of *Strickland*; nor was it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Lovejoy is not entitled to federal habeas relief as to this claim.

### 3. Failure Request Jury Instruction (Ground Four)

In Ground Four, Lovejoy argues trial counsel was ineffective in failing to request a jury instruction negating a financial gain motive for murder. (*See* FAP at 86.) Trial counsel sought such an instruction after jury deliberations had begun, and it was denied. Petitioner states that "counsel would have been entitled to such instructions if the request had been timely made," (*see id.*) but offers no authority for such a proposition.

Respondent argues this claim is unexhausted because Petitioner failed to raise it before the California Supreme Court. (*See* ECF No. 50-1 at 20–21.) But in Lovejoy's petition for review to the California Supreme Court, she argued counsel failed to request a "pinpoint instruction" explaining that the settlement payment obligation would not be lifted in the event of Mulvihill's death. (*See* ECF No. 51-39 at 15.) While the claim raised in the

petition for review is phrased more generally, the Court finds it was sufficient to give the state high court a fair opportunity to rule on the merits of the issue. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (requiring that state prisoners give state courts a "fair opportunity to act on their claims"). Thus, the claim is exhausted.[8]

In any event, the claim fails on the merits. Where there is no reasoned state court decision on his issue, the Court must conduct an independent review of the record to determine whether the state court's decision was "objectively unreasonable." *Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir. 2014) (quoting *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013). "Crucially, this is not a de novo review of the constitutional question." *Walker*, 709 F.3d at 939. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102.

Here, Petitioner has failed to show denial of the claim was objectively unreasonable under clearly established federal law. First, Petitioner appears to presume the trial court would have granted any request counsel made about instructing the jurors on lack of financial gain. But Petitioner fails to indicate what such an instruction should have included, and does not elaborate on the wholly conclusory statement that "[defense] counsel would have been entitled to such instructions." (*See* FAP at 86.) No evidence was presented at trial that the obligation to pay the settlement would be lifted if Mulvihill died prior to payment. Counsel's failure to request such an instruction does not amount to a deficient performance because, as discussed above, the prosecutor's argument was not improper.[9] As such, Lovejoy cannot show deficient performance by defense counsel and

---

[8] Even assuming the claim was not fairly presented to the California Supreme Court, if Petitioner attempted to raise it there now, it would almost certainly be procedurally barred as untimely. Thus, the claim would be "technically" exhausted. *See Gray v. Netherland*, 518 U.S. 152, 161 (1996) (noting that the exhaustion requirement may be technically satisfied notwithstanding a failure to present a claim to the state supreme court, "if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law").

[9] Lovejoy makes much of the fact that when ruling on defense counsel's request to reopen

likewise cannot show she was prejudiced. *See Strickland*, 466 U.S. at 689–90; *see also United States v. Shetty*, 76 F. App'x 842, 845 (9th Cir. 2003) ("[T]rial counsel's failure to request an unnecessary instruction was not unreasonable or prejudicial.)

The denial of the claim was not an unreasonable application of clearly established federal law, nor was it based on an unreasonable interpretation of the facts. Accordingly, she is not entitled to relief as to this claim.

### 4. Failure to Memorialize Oral Agreement with Prosecutor (Ground Five)

Next, Petitioner argues trial counsel was ineffective in failing to require in writing the prosecutor's purported assurance that she would not argue "financial gain" as a motive. (FAP at 87.) Petitioner raised this claim in her habeas petition filed with the California Supreme Court, (ECF No. 51-41 at 21–24) and the court denied the petition without comment or citation. (ECF No 51-42.) Thus, this Court must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Himes*, 336 F.3d at 853.

Petitioner states that counsel "believed he had an oral agreement with the prosecutor assuring [him] the prosecution would not argue Petitioner had a financial gain motive to murder her ex-husband." (FAP at 88.) Lovejoy acknowledges the prosecutor denied any such agreement existed. (*See id.*; *see also* ECF No. 51-29, Rep. Tr., vol. 15 at 2117–18.) Petitioner offers no declaration from counsel or any other evidence showing the existence of an agreement much less the precise nature of any purported agreement.

---

the case or further instruct the jury, the trial court, outside the presence of the jury, remarked that it seemed any settlement money would likely go to Mulvihill's and Lovejoy's son and thus, as a practical matter, Lovejoy may be able to have some control over the funds presuming she maintained full custody of her son. But this was all speculation. No evidence of this nature was presented to the jury. And the evidence regarding the $120,000 settlement was not sprung upon the defense. Indeed, the complete settlement agreement was introduced into evidence. (ECF No. 51-22, Rep's Tr. vol. 8 at 879–80.)

3:22-cv-0267-L-GC

Even assuming an informal agreement existed, a mere failure to get it in writing does not amount to deficient performance. *See Strickland*, 466 U.S. at 689–90 (stating "assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Harrington*, 562 U.S. at 105. In addition, as discussed above, Lovejoy cannot show failure to memorialize the alleged agreement was prejudicial because, as discussed above, the prosecutor did not improperly argue that Mulvihill's death would result in Lovejoy being relieved of her obligation to pay the settlement. Therefore, the state court's denial of this claim was neither based on an unreasonable application of clearly established law; nor was it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Lovejoy is not entitled to relief as to this claim.

### 5. Failure to Object During Rebuttal Argument (Ground Six)

Finally, Lovejoy argues defense counsel was ineffective in failing to object during the prosecutor's rebuttal argument. (FAP at 88.) Because the California Supreme Court denied this claim without comment or citation, (*see* ECF No. 51-41 at 26, ECF No 51-42), this Court must conduct an independent review of the record to determine whether denial is contrary to, or an unreasonable application of, clearly established law. *See Himes*, 336 F.3d at 853.

Counsel's performance cannot be deficient for failing to take futile action. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (stating "failure to take a futile action can never be deficient performance"). As discussed above, the state appellate court reasonably concluded there was no improper argument and therefore any failure to object was neither deficient performance, nor prejudicial. *See James v. Borg*, 24 F. 3d 20, 26 (9th Cir. 1994) ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel.") Therefore, the state court's denial of the claim was neither contrary to, nor an unreasonable application of clearly established law; nor was it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Petitioner is thus not entitled to relief as to this claim.

/ / / / /

**D.      Senate Bill Nos. 1437 and 775 (Grounds Three, Ten and Eleven)**

In Grounds Three, Ten, and Eleven, Lovejoy raises claims related to California Senate Bill Nos. 1437 ("SB 1437") and 775 ("SB 775") and the impact they may have had on her convictions. (*See* FAP at 76–86, 92–95.)

The California Legislature enacted SB 1437, which took effect on January 1, 2019, to "'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" *People v. Martinez*, 31 Cal. App. 5th 719, 722 (Cal. App. 2019). Under SB 775, which took effect January 1, 2022, these provisions were expanded to apply to persons with attempted murder or manslaughter convictions. *See People v. Delgadillo*, 14 Cal. 5th 216, 223 n.3 (2022), as modified (Feb. 15, 2023).

### *1. California Senate Bill No. 1437 (Ground Three)*

In Ground Three, Lovejoy argues that California SB 1437 requires her conviction for attempted murder to be set aside. (*See* FAP at 76–86.) Respondent contends this claim is based on interpretation of state law and as such is not cognizable on federal habeas. (ECF No. 50-1 at 19–20.)

The last reasoned opinion to address this claim is that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805–06. The court denied the claim, concluding that, even assuming the jury was improperly instructed on the "natural and probable causes theory," review of the "record clearly demonstrates that the jury found that Lovejoy intended to kill Mulvihill." (ECF No. 51-38 at 73.)

First, Respondent is correct that federal habeas relief is not available for errors relating solely to the interpretation or application of state law. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law[.]"). A petitioner may seek federal habeas relief from a state court conviction or sentence "only on the ground that he is in custody in violation of the Constitution or laws

or treaties of the United States." 28 U.S.C. § 2254(a); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam). Thus, "claims premised on Senate Bill No. 1437 are not cognizable on federal habeas review." *Ross v. State*, No. 5:21-cv-1889-MEM-FPD, 2022 WL 2204141, at *2 (C.D. Cal. Apr. 6, 2022); *see also Young v. Cueva*, No 20-cv-8304-CJC (E), 2021 WL 371752, at *3–4 (C.D. Cal. Jan. 8, 2021) (concluding petitioner's challenge to his conviction and sentence based on Senate Bill No. 1437 failed to state cognizable claim on federal habeas review), *accepted by*, 2021 WL 784954 (C.D. Cal. Mar. 1, 2021); *Calderon v. Covello*, No. 22-cv-03881 BLF (PR), 2023 WL 5420229, at *3 (N.D. Cal. Aug. 22, 2023) (finding the petitioner's claim that he was entitled to resentencing under SB 1437 was not cognizable on federal habeas); *Davis v. Munoz,* No. 5:19-cv-00329-JAK-SHK, 2019 WL 2424540, at *1 (C.D. Cal. May 2, 2019) (stating that whether a petitioner is entitled to relief under SB 1437 is solely a matter of state law)*, accepted by* 2019 WL 242410 (C.D. Cal. June 7, 2019).

Second, even assuming the state court misapplied state law, such an error does not rise to the level of a federal due process violation unless the interpretation of state law was arbitrary or capricious. *See Richmond v. Lewis*, 506 U.S. 40, 50 (1992). "Federal courts will not review a state supreme court's interpretation of its own statute unless that interpretation is clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state of rights guaranteed by the Constitution." *Knapp v. Cardwell*, 667 F.2d 1253, 1260 (9th Cir. 1982).

Here, the state appellate court reasonably concluded that the jury's verdict shows it found she had the intent to kill and as such, any purported error in instructing them on the natural and probable causes theory was harmless. The trial court instructed the jury that in order to find Lovejoy guilty of conspiracy to commit murder (count one), they must find she and McDavid agreed "to intentionally and unlawfully kill" and "at the time of the agreement the defendant and the other alleged member of the conspiracy intended that one or more of them would intentionally and unlawfully kill." (ECF No. 51-2, Clerk's Tr. at 331; *see also* CALCRIM 563.) The instruction also required the jury to find Lovejoy

"committed at least one of [several enumerated] overt acts to accomplish the killing." *Id.* And the jury was specifically instructed that "[s]omeone who merely accompanies or associates with member of a conspiracy *but who does not intend to commit the crime is not a member of the conspiracy.*" (ECF No. 51-2, Clerk's Tr. at 335 (emphasis added); *see also* CALCRIM 463.) Finally, in conjunction with the above, the jury was instructed on how to determine whether a defendant had acted with "intent" to commit murder as follows:

> To prove that a defendant intended to commit the crime of murder the People must prove that: (1) The defendant intended to commit the act to cause the death of another person; (2) When the defendant formed the intent to kill, he or she had a state of mind called malice afterthought; AND (3) When the defendant formed the intent to kill, he or she had no lawful excuse or justification to kill.

(ECF 51-2, Clerk's Tr. at 336; *see also* CALCRIM 520.) Thus, as the state appellate court reasonably concluded, review of the instructions and the jury's verdict as a whole make clear that Petitioner was not convicted under the natural and probable consequences theory.

Therefore, the state court's determination that Petitioner was not eligible for relief under SB 1437 was not arbitrary or capricious. *See Richmond*, 506 U.S. at 50. Even assuming her claim were cognizable on federal habeas, Petitioner would not be entitled to federal habeas relief.

### 2. California Senate Bill Nos. 1437 and 775 (Grounds Ten and Eleven)

In Grounds Ten and Eleven, Lovejoy again argues the state court denied her due process and her convictions for attempted murder (Ground 10) and conspiracy to commit murder (Ground 11) are "invalid" under SB 1437 and SB 775. (FAP at 92–95.) She cites to *Hicks v. Oklahoma*, 447 U.S. 343 (1980) as support for both grounds. (*Id.* at 93, 95.) Respondent contends both grounds should be denied because they fail to raise cognizable federal habeas claims. (*See* ECF No. 50-1 at 25–26.)

Lovejoy raised both of these claims in her petition for writ of habeas corpus filed with the California Supreme Court, which was denied without comment or citation. (*See* ECF Nos. 51-41, 51-42.) Because there is no reasoned opinion from a state court, this Court

must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Himes*, 336 F.3d at 853 (9th Cir. 2003).[10]

First, as discussed above, the allegation that the state courts did not comply with California Senate Bill Nos. 1473 and 775, as a matter of California state law, is not cognizable on federal habeas. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (stating that mere errors in application of state law are not cognizable on habeas corpus); *Rhoades v. Henry*, 611 F.3d 1133, 1142 (9th Cir. 2010) (noting violations of state sentencing law are not cognizable on federal habeas review). Therefore, to the extent Petitioner seeks federal habeas relief on the grounds that she is entitled to resentencing under Cal. Penal Code § 1172.6 (previously numbered as Cal. Penal Code § 1170.95) pursuant to Senate Bill Nos. 775 and 1437, federal district courts have repeatedly held that "a state court's allegedly erroneous denial of resentencing" under Cal. Penal Code § 1172.6 "does not raise

---

[10] While the parties do not reference it, the Court takes judicial notice that in 2022 Lovejoy sought resentencing as to her attempted murder conviction in the San Diego County Superior Court Case No. SCN363925, based on the changes in California law set forth in Senate Bill Nos. 1437 and 775. *See Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007) (stating a district court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"). On August 26, 2022, the trial court denied Lovejoy relief and she appealed to the California Court of Appeal. *See People v. Lovejoy*, 101 Cal. App. 5th 860, 863 (Cal. App. 2024). On May 2, 2024, the appellate court issued a published opinion, denying her relief. *See id*. The appellate court noted that "[f]ollowing the passage of Senate Bill 775 in 2022, it is now clear that defendants like Lovejoy convicted of attempted murder are potentially eligible for relief under section 1172.6 if the conviction could have been based on the natural and probable consequences doctrine." *Lovejoy*, 101 Cal. App. 5th at 865. But the Court went on to conclude, again, that Lovejoy's "factual theory cannot be squared with the instructions and the jury's verdict." *Id*. at 866. The stated: "In short, because the jury necessarily found that Lovejoy personally possessed an intent to kill as part of a conspiracy to commit murder, she is ineligible for relief under section 1172.6. (*People v. Allen* (2023) 97 Cal.App.5th 389, 393, 398, 315 Cal.Rptr.3d 323.)" *Id*. at 870–71. Lovejoy filed a petition for review in the California Supreme Court and it was denied without comment or citation on July 24, 2024 in Case No. S285447. *See id*. at 871.

an issue cognizable on federal habeas review." *Walker v. California Supreme Ct.*, No. 22-cv-4638-CAS, 2022 WL 11337927, at *2 (C.D. Cal. Sept. 13, 2022), report and recommendation adopted by 2022 WL 11269388 (C.D. Cal. Oct. 13, 2022); *Calderon v. Covello*, No. 22-cv-03881 BLF (PR), 2023 WL 5420229, at *3 (N.D. Cal. Aug. 22, 2023) ("Petitioner's challenge to the state court's denial of his resentencing petition under Penal Code § 1170.95 only involves the interpretation and application of state sentencing laws and does not give rise to a federal question cognizable on federal habeas review."); *see also McCavitt v. Covello*, No. 2:22-cv-1926-KJM-KJN, 2022 WL 17813204, at *2 (E.D. Cal. Dec. 12, 2022) ("Petitioner fails to state a cognizable federal habeas claim because the California state courts applied state law, Senate Bill 1437, and determined that petitioner is not eligible for state law relief."), adopted by 2023 WL 2602019 (E.D. Cal.  Mar. 22, 2023); *Carter v. Montgomery*,  No. 20-cv1303-SB-PVC, 2021 WL 2044499, at *11 (C.D. Cal. Apr. 12, 2021) ("[A]ny claim of an entitlement to resentencing [under Senate Bill 1437] is strictly a matter of state law to which this Court must defer"), adopted by 2021 WL 2042723 (C.D. Cal. May 13, 2021); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2006) (per curiam) ("[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.").

Petitioner argues these claims are more than a matter of state law because "the Fourteenth Amendment preserves against arbitrary deprivation by the state." (FAP at 95; *see also id.* at 93.) She cites *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Beyond this conclusory assertion, however, Petitioner offers no basis to show that the state appellate court's decision was arbitrary or capricious. A mere citation to *Hicks* does not transform her state law claims into an entitlement to federal habeas relief. *See Langford v. Day*, 110 F.3d 1380,1389 (9th Cir. 1996) (stating a habeas petitioner "may not . . . transform a state-law issue into a federal one merely by asserting a violation of due process"); *see also Stevenson v. Los Angeles Superior Ct.*, No. 19-cv-4622-CJC-JC, 2019 WL 2437001, at *4 (C.D. Cal. June 10, 2019) (noting citation to *Hicks* "do[es] not transform [the petitioner's] state law claims into a

3:22-cv-0267-L-GC

federal entitlement by asserting a violation of due process"); *Doughton v. Montgomery*, 2021 WL 3186567, at *3 (E.D. Cal. July 28, 2021) (rejecting petitioner's attempt to transform his SB 1437 claim into a federal one). Accordingly, Petitioner is not entitled to federal habeas relief as to Grounds Ten and Eleven.

## VI.    CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a). The district court may issue a certificate of appealability if the petitioner has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Under this standard, a petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, the Court finds Petitioner has failed to make "a substantial showing of the denial of a constitutional right," and reasonable jurists would not find debatable this Court's assessment of her claims. *See id.* Accordingly, a certificate of appealability is **DENIED**.

## VII.    CONCLUSION

Based on the foregoing, the Court **DENIES** the petition for writ of habeas corpus and **DENIES** a certificate of appealability.

**IT IS SO ORDERED.**

Dated:  May 18, 2026

Hon. M. James Lorenz
United States District Judge

3:22-cv-0267-L-GC